# FAIRCHILD *a.* GWYNNE.

*Supreme Court, First District; Special Term, February,* 1862.

CONSTRUCTION OF STATUTES.—AFFIRMATIVE AND NEGATIVE WORDS. —VALIDITY OF ASSIGNMENTS FOR THE BENEFIT OF CREDITORS.— ACT OF 1860.

A statute which by its terms is to go into effect immediately, is operative from the instant of its final passage.

An affirmative statute does not take away the common law.

The provisions of the act of April 13, 1860 (*Laws of* 1860, 595, ch. 348),—which require general assignments for the benefit of creditors to be acknowledged by the assignor before delivery, and schedules to be made within twenty days thereafter,—are directory merely.

Trial by the Court.

This action was brought by Frederick Fairchild, as receiver of the property of Thomas Gwynne, against Thomas Gwynne, and J. A. Gwynne, assignee, to set aside a general assignment for the benefit of creditors, made by Thomas on the 2d day of May, 1860. This assignment was not acknowledged before delivery. It was proved by the subscribing witness on June 8, 1860. Plaintiff was appointed receiver October 1, 1860; and having filed his bond, commenced this action October 2, 1860, to set aside this assignment for want of the acknowledgment required by the act of 1860 (*Laws of* 1860, ch. 348), and for non-compliance with the provisions of that act.

After this action was commenced, the assignee, on the 24th of January, 1861, filed the account of the indebtedness of Thomas Gwynne and the inventory of his estate; and on that day the assignment was acknowledged and recorded. On the 25th day of January, 1861, the assignee filed his bond as assignee of the estate of Thomas Gwynne; and the defendants, in their answer in this action, alleged such subsequent compliance with the act of 1860 as sufficient. The assignment preferred Gwynne and Day for $763 : the rest of the property was to be divided among the creditors without preference.

*James R. Hills*, for the plaintiff.—I. The act of 1860 was, by its terms, to take effect immediately. The provisions of 1 Rev. Stat., 157, § 12, have no application whatever to this act, as the time when the act shall take effect "immediately" is prescribed in the act of 1860.

II. The receiver acquired all the title Thomas Gwynne had to the assigned property on the date of his appointment, October 1, 1860. The assignment had not been at that time acknowledged, as required by the act of April 13, 1860. The statute requires the assignment to be acknowledged before delivery. Proof of the execution does not satisfy the requirements of the statute. (12 *Abbotts' Pr.*, 36.)

III. This act applying to *all* assignments, whether of "real or personal" property, "or both," and requiring all to be "acknowledged before the delivery thereof to the assignee," is imperative. The language used is plain and unequivocal: it alters the law as it previously stood, so far as the statute necessarily conflicts with it (the requirement of acknowledgment,

antecedent to a valid delivery of the assignment). The rule that an affirmative statute does not take away the common law, or repeal a previous statute, is not correct. Lord Coke corrected the rule as first laid down by him, and laid it down later in life, as " a statute made in the affirmative, without any negative expressed or implied, does not take away the common law." (2 *Inst.*, 200; see, also, *Hargrave & Butler's Notes, ad loc.*) Here is an implied negative; no other mode is allowed than that of acknowledgment antecedent to delivery, and it applies to all assignments made, or to be made, after April 13, 1860. Where the common law and a later statute differ, the common law must give way to the statute (1 *Blk. Com.*, 61), for such is the manifest intent of the Legislature. The object of all maxims of interpretation is to ascertain the intent of the Legislature. The intent of the Legislature in this case is too plain to be mistaken; and the fact that all parties making assignments have complied with the requirements of section 1, Act of 1860, as to acknowledgment before delivery, shows that there has been no misunderstanding as to the intent of the Legislature, and no need of legal maxims to ascertain the intent of the Legislature.

IV. The words of the title of this act show that the provisions of the act were meant " for the benefit of creditors." The creditors are the parties who can complain of a non-compliance with provisions of the act, not the parties to the instrument. The title is never permitted to control the plain words of the statute. When the meaning is obscure, we may resort to the title to assist us to ascertain the intent of the Legislature. But it is not obscure here; it is as plain as language can make it; and such construction ought to be given as will not suffer the statute to be defeated. (15 *Johns.*, 358.) By any other construction than that contended for, the act of 1860 is a nullity, and the intent of the Legislature is wholly defeated. The cases of affirmative statutes cited by defendants are not cases of universal affirmation; and a necessary conflict does not arise by construing them as permitting the previous law and the new law to coexist. But in the case of the act in question, it is impossible to require an acknowledgment as a prerequisite to delivery, and allow the old law, which did not require it, to coexist: if the acknowledgment be unnecessary, then the act of 1860 is a nullity. The

law having required the acknowledgment before delivery, and no title vesting in the assignee till delivery, the property remains with the assignor till compliance with this prerequisite.

*Theodore F. Jackson*, for the defendant.

CLERKE, J.—I see nothing on the face of this assignment, or in the conduct of the parties, to affect its validity.

The only question, therefore, which I shall consider, is the effect of the act of April 13, 1860.

The assignment was signed, sealed, and delivered on the 2d of May, 1860. It was not acknowledged before any authorized officer previous to the delivery, but was proved before a commissioner by the subscribing witness on the 8th of June, 1860. It was, however, acknowledged by the subscribing party on the 24th of January, 1861, when the inventory and schedule were filed in the office of the clerk of the county of Kings. The assignment was recorded and the bond filed in the said office on the 25th of January, 1861.

I. By the terms of the act of 13th April, 1860, it was to take effect *immediately*. It is contended, on behalf of the defendants, that, notwithstanding the employment of this word, it did not take effect until twenty days after its date. It is insisted that, as the Revised Statutes (1 *Rev. Stat.*, 157, § 12) enact that "every law, unless a different time shall be prescribed therein, shall commence and take effect on and not before the twentieth day after the day of its final passage, as certified by the secretary of state,"—and that as this act does not prescribe a different time, it did not go into effect until twenty days after the 13th of April, 1860. The word *immediately*, it is maintained, does not prescribe a different time, but has reference to the time fixed by the general statute, *i. e.*, immediately upon the expiration of the time specified therein. This I consider a very forced construction. If the Legislature intended that it should not go into effect until twenty days after its final passage, it would either have expressly said so, or would have mentioned no time at all. But the word *immediately* means what every man, learned or unlearned, would at once understand,—that is, that the act should go into effect at the instant of its final passage.

II. This assignment, then, having been executed and deliv-

ered after this act of April 13, 1860, went into effect, and its execution and delivery not being according to the method directed by the act, is it nevertheless totally void, or are the provisions of the act to be deemed only directory?

Now, in instituting this inquiry, we are not to speculate upon the intention of the Legislature. We are to ascertain that intention by the known rules of law existing at the time of the act. It may have been the design of some or all of the members of that body, that every assignment thereafter made, in a manner not strictly in conformity with the act, should be absolutely void; but if they omitted to employ the language or the terms which the law declares to be alone indicative of that design, it is not to be regarded as within the scope of the act. Laws are to be made by the Legislature, as well as decisions by the judicial tribunals, in reference to existing rules of interpretation and guidance.

Some statutes are, from their being in affirmative terms, called affirmative; others obtain the name of negative statutes, because they are penned in negative terms. (*Bacon's Abr.*, "Statute," G.)

It is a maxim of law that an affirmative statute does not take away the common law. In the words of Lord Coke, "A statute made in the affirmative, without any negative expressed or implied, does not take away the common law." (2 *Inst.*, 200.)

Where the question was, whether an appointment of overseers, made after the expiration of the time limited by a statute (43 *Eliz.*, c. 2) for such appointment, was valid, it was holden to be so; and it was added, although that statute be introductive of a new law, no negative ought to be implied against the meaning and justice thereof. (Rex *a.* Spanow, 2 *Stra.*, 1123; Rex *a.* Stubbs, 2 *Term R.*, 395, S. P.)

In Rex *a.* Gravesend (3 *B. & Ad.*, 240), Lord Tenterden recognizes the distinction, in reference to The King *a.* St. Nicholas, Ipswich (*Stra.*, 1066; *Burr.*, 91). He says: "The clause which was relied upon in The King *a.* St. Nicholas for the purpose of showing the indenture to be void, is the 26th section. But this 26th section is not negative or prohibitory; it is permissive only. The 5th section of the statute (10 *Geo. II.*, c. 31) is negative and prohibitory. Section 4 prohibits a waterman from taking more than two apprentices. The contract, then,

was a prohibited contract, and this case falls within the principle of the decision of this court in The King a. The Inhabitants of Hipswell (8 B. & C., 466). Upon the authority of that case, and upon the distinction between a prohibited contract and a provision like that of the 26th section of the statute of Elizabeth, we are of opinion that this indenture of apprenticeship was absolutely void," &c.

In Pearse a. Morrice (2 Ad. & E., 96), TAUNTON, J., says: "The distinction between directory and imperative statutes has been long known; an early instance in which it was taken is the case of Rex a. Spanow (2 Stra., 1123), as to the time of choosing overseers. I understand the distinction to be, that a clause is directory where the provisions contain mere matter of direction and nothing more; but not so where they are followed by such words as are used here, viz., that any thing done contrary to such provisions shall be null and void to all intents. These words give a direct, positive, and absolute prohibition, which cannot be dispensed with by the construction here contended for. In Rex a. Gravesend (3 B. & Ad., 240), the ground upon which Lord Tenterden distinguished the case from Rex a. St. Nicholas, Ipswich, was, that in the latter case, the words of the section relied on were not negative or prohibitory, but permissive only; whereas in Rex a. Gravesend the statute (10 Geo. II., c. 31, § 5) contained a direct prohibition."

In Rex a. Justices of Leicester, the act under consideration required that the justices shall make their sessions on certain days as therein specified, but it contained no negative or prohibitory words. Lord Tenterden says: "Looking at the earlier statutes upon the subject, we find that, by the 12 Rich. II., c. 10, the justices are required to keep their sessions in every quarter of the year at least; but no particular days are specified. By the 2 Hen. V., St. 1, c. 4, it was enacted that they shall make their sessions four times a year, viz., in the first week after Michaelmas, Epiphany, Easter, and the Translation of St. Thomas the Martyr, and oftener if need be. The modern statute (54 Geo. III., c. 84), merely substitutes the week after the 11th of October for the week after Michaelmas; the question must, therefore, receive the same consideration as if that statute had never passed. Now, we find that so long ago as the time of Lord Hale, the earlier statutes to which I have referred were

considered as directory only." After quoting Lord Hale, he proceeds: "It has been asked, what language will make a statute imperative, if the 54 Geo. III., c. 84, be not so? Negative words would have given it that effect; but those used are in the affirmative only."

Rex *a.* The Inhabitants of Birmingham (8 *B. & C.*, 34), related to the Marriage Act (4 *Geo. IV.*, c. 75), the 14th section of which points out the mode in which licenses are to be obtained, and the matters to be sworn to by the parties, or one of them; and one of these matters, where either of the parties being a widower or widow shall be under the age of twenty-one years, is, that the consent of the person or persons whose consent to such marriage is required under the provisions of this act has been obtained thereto. Then the 16th section specifies the persons who shall have power to consent, and proceeds: "And such consent is hereby required for the marriage of such party so under age, unless there shall be no person authorized to give such consent." Lord Tenterden says: "The language of this section is merely to require consent; it does not proceed to make the marriage void, if solemnized without consent." The marriage was declared valid, and the order of the sessions was confirmed. In Gwynne *a.* Burnell (2 *Bing.*, 11, c. 39), Baron Parke observes: "It is by no means any impediment to construing a clause to be directory, that if it is so construed there is no remedy for non-compliance with the direction. Thus the statutes which direct quarter-sessions to be held at certain times in the year, are construed to be directory (Rex *a.* Justices of Leicester, 7 *B. & C.*, 6), and the sessions held at other times are not void; and yet it would be difficult to say that there would be any remedy against the justices for appointing them on other than the times prescribed by the statute. From the nature of the enactments, the courts have rightly concluded that though the Legislature intended the precise periods to be fixed, they did not intend the consequence of a deviation to be that the appointment should be void." In Thames Haven Dock & Railway Co. *a.* Rose (4 *Man. & G.*, 550), it appeared that the act of incorporation required the business of the company to be carried on by twelve directors, five of whom were to be a quorum. The directors were authorized to make calls, and in case of non-payment the company had power to sue. An

action having been brought for calls, the defendant suffered judgment by default. In Trinity Term following, he applied to set aside the judgment, upon the ground that at the time the calls were made there were only seven directors, and that he had only learned that fact after the default. The court refused the application, holding that the enactment as to the number of directors was only directory.

I am referred to other cases in which this distinction is unquestionably recognized. (Southampton Dock Co. a. Richards, 1 *Man. & G.*, 448; Wood a. Chapin, 13 *N. Y.*, 521, 526.) There is another familiar case in our own courts illustrative of this principle. The colonial act of the 8th of January, 1762,—declaring that every former division of lands of which there was a map or note in writing under the hands of the proprietors, should be a valid partition thereof, provided such map or note be proved before a judge of the Supreme Court, and a true copy of such map be filed and such note recorded,—was held not to prevent such map or deed being read in evidence to prove a partition. It was admitted, if the statute contained any negative words, as that "without such recovery, &c.," the map should not be evidence, the act would be imperative; but as it did not contain negative words, the map was admissible in evidence, in the same manner as if the act had never been passed. (Jackson, &c., a. Bradt, 2 *Cai.*, 169.)

The act of the 13th of April, 1860, now under consideration, contains no prohibitory or negative words. Certain proceedings are directed, without any prohibition or penalty, or negative words expressed or implied; unless we are to take it for granted that negative words are implied from the mere fact of the passage of the statute; which, of course, would be saying that every statute implied negative words. This, I need scarcely say, would be a complete contravention of the distinction that has so long obtained, and has been so repeatedly recognized on this subject. But it has been contended that this act is introductive of a new law, and, therefore, that it did not require negative words. If it is introductive of a new law within the meaning of the principle adverted to, it is sufficient if it is only affirmative. But is it introductive of a new law? It is, indeed, a new law in the sense in which every act of the Legislature is new when it is first passed. But it is plainly absurd to suppose that it is within

the meaning of this exception because it is recently passed. It would, like the other objection to which I have adverted, be in complete contravention of the distinction between affirmative and negative statutes, which has so long obtained and has been so repeatedly recognized. It would give to all the effect of affirmative statutes.

The words "introductive of a new law," mentioned in the exception to the general rule on this subject, can apply only to enactments embracing a subject new to the law, conferring some new right or power, or affording some new remedy. An act taking away the common law, or impairing an established right, is not within the exception. It is not introductive of a new law, but of new regulations relating to an old one.

To say that a statute like this is introductive of a new law, because it introduces new regulations, would also be in contravention of the distinction between affirmative and negative statutes. The right to make an assignment in trust for the benefit of creditors, is an ancient and well-established right. The statute of 1860 does not confer or originate it. It merely directs certain things to be done in exercising this right. It provides certain modes of doing what every citizen had a right of doing before; and if it provided, in addition to prescribing these modes, that no other would be lawful, it would have the effect claimed by the counsel for the plaintiff. The true rule is, where a statute authorizes a proceeding not before allowed by law, and prescribes the mode in which it shall be done, the mode pointed out must be strictly pursued, or the proceeding will be void; but when a proceeding is permitted by the general law, either by the common law or a previous statute, and the statute directs a particular form in which it shall thereafter be conducted, it will depend upon the terms of the statute whether it is merely directory, or whether non-compliance with the mode prescribed shall render the proceeding void.

If the statute, in such case, is only affirmative, it is directory; if negative or prohibitory, it is imperative.

The act of 13th April, 1860, is, consequently, merely directory; and as no fraud has been proved before me to vitiate the assignment, the plaintiff must fail in his action.

Judgment for the defendants, without costs.